IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

TINA DOWNING,                          )
                                       )
              Plaintiff,               )
                                       )
       v.                              )      Case No.
                                       )      12-4140-CV-C-REL-SSA
CAROLYN W. COLVIN, Acting              )
Commissioner of Social Security,       )
                                       )
              Defendant.               )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Tina Downing seeks review of the final decision of the Commissioner of Social
Security denying plaintiff's application for disability benefits under Titles II and XVI of the
Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) failing to find that
plaintiff meets listing 12.05C for mild mental retardation; (2) failing to order an IQ test; (3)
failing to consider plaintiff's cervical dystonia, scoliosis, Botox injections, and loss of range of
motion; and (4) rendering a decision not supported by the substantial record as a whole
including records from Dr. Garth Russell submitted to the Appeals Council. I find that the
substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not
disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision
of the Commissioner will be affirmed.

## I.     BACKGROUND

On April 3, 2009, plaintiff applied for disability benefits alleging that she had been
disabled since March 16, 2009. Plaintiff's disability stems from a learning disability and
shoulder problems. Plaintiff's application was denied on July 6, 2009. On February 12, 2010,
a hearing was held before an Administrative Law Judge. On August 25, 2010, the ALJ found
that plaintiff was not under a "disability" as defined in the Act. On March 28, 2012, the

Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

2

### III.     *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.  <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir. 2000); <u>Brock v. Apfel</u>, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, <u>et seq.</u>  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.     Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.     Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.     Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.     Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

3

5. Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert Julie Harvey, in addition to documentary evidence admitted at the hearing and before the Appeals Council.

## A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

## Earnings Record

The record establishes that plaintiff earned the following income from 1986 through 2009:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1986 | $ 4,801.39 | 1998 | $ 1,534.70 |
| 1987 | 1,225.28 | 1999 | 2,493.83 |
| 1988 | 0.00 | 2000 | 7,262.97 |
| 1989 | 0.00 | 2001 | 5,744.06 |
| 1990 | 0.00 | 2002 | 7,851.62 |
| 1991 | 0.00 | 2003 | 14,426.20 |
| 1992 | 0.00 | 2004 | 11,186.00 |
| 1993 | 0.00 | 2005 | 13,763.45 |
| 1994 | 0.00 | 2006 | 8,884.82 |
| 1995 | 0.00 | 2007 | 15,989.68 |
| 1996 | 0.00 | 2008 | 19,408.48 |
| 1997 | 0.00 | | |

(Tr. at 111).

## Disability Report - Adult

In an undated Disability Report, plaintiff stated that she can read and understand English, she can speak and understand English, she can write in English (Tr. at 129-136). The conditions which limit her ability to work are a learning disability and a bad shoulder (Tr. at 130). When asked how her condition limits her ability to work, she wrote, "I have trouble

4

lifting because of my shoulder. I am very uncomfortable sitting up and I need a heating pad to help relieve the pain. I have trouble learning new tasks and it takes me longer. I sometimes have trouble moving my neck and shoulder at the same time because of the pain."

### Function Report - Adult

In a Function Report dated May 5, 2009, plaintiff reported that she lives in a mobile home with her son (Tr. at 138-146). She described her typical day as follows:

> I wake up usually at 8:00 am. I make me some coffee & I feed my 2 dogs, Scrappy & Chomper & I wait for my son to wake up & then I make us some breakfast. I start doing some of my chores like doing breakfast dishes, vacuming [sic], cleaning the bathroom, doing the laundry & I check on my friends & see how they are & I sit down & watch movies or I listen to my music. Sometimes I fix lunch & sometimes I wait & fix dinner & in the evenings I sit down & watch more movies or I go to a friend's house & visit.

Plaintiff cooks and does laundry for her 19-year-old son. She bathes her two dogs and feeds them, but her son walks them. When she was asked what she was able to do before her condition that she cannot do now, plaintiff wrote, "N/A" (Tr. at 140). Her condition does not affect her ability to sleep, perform personal care, or cook. She needs no special reminders to take care of personal needs and grooming or to take medication. Plaintiff prepares complete meals with several courses, pizzas, french fries, meat and potatoes and a couple of vegetables. She cooks three times a day for 30 to 45 minutes per meal.

Plaintiff does the cleaning and dishes, she does laundry at least three times a week, she cleans out closets and cabinets. Someone else mows for her because she does not have a lawn mower. Plaintiff likes doing her own housework and staying busy.

Plaintiff goes out sometimes multiple times a day; however, she does not go out every day because she does not have any money. When she does go out she is able to drive a car or ride in a car, and she can go out alone. She shops in stores for food, clothes, dog food, and household supplies. She shops for three or four hours at a time once a month. Plaintiff is able

Case 2:12-cv-04140-REL   Document 20   Filed 04/22/13   Page 5 of 37

to pay bills, handle a savings account, count change, and use a checkbook.

Plaintiff's hobbies and interests include playing with her dogs, watching movies, listening to music and visiting with family and friends. She does these things every day, and her ability to do these things has not been affected by her condition.

When asked to circle the abilities that are affected by her condition, plaintiff did not circle lifting, squatting, bending, standing, walking, sitting, kneeling, talking, hearing, stair climbing, seeing, memory, completing tasks, concentration, understanding, using her hands, or getting along with others. Plaintiff indicated that she can pay attention "a long time -- all day" (Tr. at 144). She finishes what she starts, she follows written and spoken instructions "very well," she handles changes in routine "pretty good," but she does not handle stress well.

**Missouri Supplemental Questionnaire**

In a Missouri Supplemental Questionnaire dated May 5, 2009, plaintiff reported that she works puzzles and watches movies for two hours at one sitting (Tr. at 148).

**Claimant's Recent Medical Treatment**

In a form entitled Claimant's Recent Medical Treatment, plaintiff was asked, "What have these doctors told you about your condition? (Tr. at 170). Plaintiff wrote, "Rheumatoid Arthritis & that I should be back on Disability & I was on Disability because of my Learning Disability. My neck & shoulder has never changed."

**B.    SCHOOL RECORDS**

**High School Transcript**

Plaintiff's high school transcript shows that she earned, on a scale with ESMIF (rather than ABCDF) two semester grades of "E," one "S," eight "M," twenty "I," and three "F" (Tr. at 121). However, half of the class names were cut off in copying, and some of the grades at the bottom were cut off in copying.

**Letter from High School Counselor**

In a letter dated November 4, 1987, Charles Whitten, a counselor at plaintiff's high

school wrote a letter which reads as follows:

> This letter has reference to Tina Bullard who was a student at Boonville R-I High School from August, 1981 to January, 1986. She received an EMH Diploma at the end of the 9th semester in January, 1986.[1]
>
> I administered the Stanford-Binet Test to Tina on May 20, 1985:
> Chronological Age: 18 years, 6 months
> Mental Age: 10 years, 2 months
> IQ: 63
>
> On that IQ Test at Age 18 1/2 years of age she performed so much like an average fourth grader, ten year old would have done.
>
> I found her to be very pleasant and cooperative in school. It is also fair to say that she had extreme difficulty with most of her classes. It is also my opinion that she was very unrealistic in looking at and solving the everyday problems she encountered. She was unable to anticipate consequences.
>
> It is my professional opinion that Tina is unable to cope with the demands in the world of work and will have to be under the umbrella of our social system.

(Tr. at 123).

**Letter from Boonslick Area Vocational Technical School Counselor**

Sylvia Remington, a counselor at the Boonslick Area Vocational Technical School, wrote

a letter to the Office of Social Security on November 4, 1987, which states as follows:

> It is my opinion that Tina Bullard's handicap, as assessed by Boonville High School, is a hindrance to her employability. In my contact with Tina I felt she was unable to make independent judgments and needed assistance and guidance. Tina's attitude was always positive and she was willing to work hard on tasks here at the vocational school.
>
> It is my recommendation that she be considered as a recipient for Social Security benefits.

---

[1]Plaintiff's diploma shows that she graduated on May 18, 1986. She took classes during 9th through 12th grades (from 1981 through 1985) and then had "job training" for the "1985-86 [school] year". (Tr. at 121).

7

(Tr. at 122).

C.     *SUMMARY OF MEDICAL RECORDS*

On November 23, 2004, plaintiff saw Martin Childers, D.O., for a Botox[2] injection for cervical dystonia[3] (Tr. at 217-218). "She was pleased with the results of her last treatment about 3 months ago. Currently, she rates her disability as moderate with associated pain. She rates it 8/10."

On February 22, 2005, plaintiff saw Dr. Childers for a Botox injection for her cervical dystonia (Tr. at 219-220). "She was pleased with the results of her last treatment and would like treatment again today."

On June 6, 2005,[4] plaintiff saw Janet Akremi, M.D., for ongoing stomach problems (Tr. at 230). The record states that plaintiff pulled her left shoulder at work. The physical exam related only to plaintiff's heart, lungs, and digestive system. Dr. Akremi assessed

---

[2]Botox injections are the best known of a group of medications that use various forms of botulinum toxin to temporarily paralyze muscle activity. This toxin is produced by the microbe that causes botulism, a type of food poisoning. Noted primarily for the ability to reduce the appearance of some facial wrinkles, Botox injections are also used to treat such problems as repetitive neck spasms (cervical dystonia).

[3]Cervical dystonia, is a condition in which the neck muscles contract involuntarily, causing the head to twist or turn to one side, or causing the head to uncontrollably tilt forward or backward.

[4]The year of this record is difficult to read. It appears to be an 8; however, in her brief plaintiff indicates that this occurred in 2007. Neither can be correct, however. Dr. Akremi prescribed Zelnorm which was withdrawn from the U.S. market on March 30, 2007. Because this record appears between a record dated September 3, 2004, and one dated July 8, 2005, and because it had to have occurred prior to March 30, 2007, I will assume that this appointment occurred on June 6, 2005.

8

gastroesophageal reflux disease ("GERD"), chronic cervical dystonia, scoliosis,[5] and left shoulder strain. She prescribed Zantac and Zelnorm, both for GERD. "Has had good results with botox injections every three months for cervical dystonia."

On July 8, 2005, plaintiff saw Dr. Akremi for a rash (Tr. at 231).

On September 16, 2005, plaintiff saw Dr. Akremi for a headache (Tr. at 232). "Always has tightness in neck with sloping of shoulders due to her scoliosis." Dr. Akremi assessed headaches and scoliosis. She prescribed Phenergan (for nausea), Norflex (muscle relaxer), and suggested massage therapy.

On November 2, 2005, plaintiff saw Dr. Akremi for lower abdominal pain and a cough (Tr. at 233). Dr. Akremi checked plaintiff's blood sugar and ordered a urine test. Plaintiff was otherwise normal.

On January 28, 2006, plaintiff saw Dr. Akremi and complained of pain starting at her right hip and going down to her toes (Tr. at 234). She was assessed with "right hip pain (acute exacerbation) and was given a prescription for Hydrocodone (narcotic) and told to take Ibuprofen.

On March 24, 2006, plaintiff saw Dr. Akremi for a follow up (Tr. at 235). She reported a good response to Hydrocodone, so Dr. Akremi gave her a refill. Plaintiff had no change in

---

[5]Scoliosis is a sideways curvature of the spine that occurs most often during the growth spurt just before puberty.



9

her physical exam. "Has fairly severe loss of range of motion in neck, sloping of shoulders". No range of motion measurements were provided. Dr. Akremi assessed "Scoliosis -- with hip/back pain, chronic, many years".

On April 4, 2006, plaintiff saw Dr. Akremi for a sore throat (Tr. at 236). She was assessed with acute bronchitis.

On October 3, 2006, plaintiff saw Dr. Akremi and complained that she had "started feeling dizzy, lightheaded, H/A [headache], clamy [sic], red face at work last night." Her headache had resolved but she continued to feel dizzy. Her physical exam was normal. She was assessed with fatigue and Dr. Akremi ordered blood work.

On October 31, 2006, plaintiff saw Dr. Akremi complaining of an ear ache (Tr. at 238). She was assessed with an ear infection.

On February 3, 2007, plaintiff saw Dr. Akremi and reported that the day before she had experienced pain in her left breast which then started radiating around her rib case to her left shoulder, neck and arm (Tr. at 239-240). Plaintiff complained of being under a lot of stress. Plaintiff objectively appeared "good." She had painful range of motion in her neck on the left side. She was assessed with shoulder strain and scoliosis with headaches. "Needs physical therapy & MRIs. Come back for massage." Dr. Akremi prescribed Hydrocodone and Prednisone (a steroid).

On February 23, 2007, plaintiff saw Dr. Akremi claiming she experienced an allergic reaction (shortness of breath) to hydrocodone (Tr. at 241-242). Plaintiff was still having severe shoulder pain. Her neck and musculoskeletal exam was normal. She was assessed with shoulder pain, headaches, scoliosis, and chronic hip and back pain. "Continue supportive care - massage - Epsom salt soaks. These are ongoing problems due to loss of mobility, abnormal stresses caused by her scoliosis."

10

On September 18, 2008, plaintiff was seen by Theresa Campbell, a nurse practitioner (Tr. at 213). Several hours earlier plaintiff had been riding in a wagon behind a lawn mower taking gas back to her house. When the person driving hit some loose gravel, the wagon turned to its side and plaintiff rolled out of the wagon and hurt her head and shoulders. Plaintiff was not knocked out, and was able to go home and take a shower before coming to this office. Plaintiff had a superficial abrasion across her upper back and on her right shoulder. She had several bruised areas on her arms and hands. Plaintiff was told to use ice on her head and shoulders, antibiotic ointment on her shoulder, and an over-the-counter anti-inflammatory twice a day for a week.

On September 22, 2008, plaintiff was seen in the emergency room after having fallen three days earlier from a wagon which was being pulled by a tractor (Tr. at 173-180). She landed on her right shoulder. Her shoulder was not dislocated and had full range of motion. She had full and pain-free range of motion in her neck and back with no tenderness (Tr. at 174). Plaintiff reported "stomach problems" as her only past medical condition. She was assessed with a shoulder abrasion and given a prescription for Percocet (narcotic), 20 tablets for use as needed every four to six hours for pain. She had a work excuse which indicated she would be able to return to work the following day, September 23, 2008.

On October 17, 2008, plaintiff had an MRI of her right shoulder which showed minimal supraspinatus tendinosis[6] (Tr. at 182-184).

---

[6]Degenerative condition of the supraspinatus tendon.



Case 2:12-cv-04140-REL   Document 20   Filed 04/22/13   Page 11 of 37

March 16, 2009, is plaintiff's alleged onset date.

On March 23, 2009, plaintiff went to the emergency room complaining of a severe cough for the past week (Tr. at 185-192). Plaintiff had walked to the hospital. Plaintiff was taking no medication for any condition. She had normal range of motion in all of her extremities with no tenderness or swelling. She was assessed with persistent cough and sinus infection and was given an antibiotic and a cough medicine with codeine (narcotic).

On April 3, 2009, plaintiff applied for disability benefits.

On July 3, 2009, Marc Maddox, Ph.D., completed a Psychiatric Review Technique finding that plaintiff's mental impairment is not severe (Tr. at 194-205). He found that plaintiff had no restriction of activities of daily living; no difficulties in maintaining social functioning; no difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation. In support of his findings, Dr. Maddox wrote:

> Claimant is a 42-year-old individual with 12 years of education alleging disability due to learning disability and bad shoulder. She reported that she stopped working in 3/09 when she came down with walking pneumonia and got in trouble for sleeping on the job. At application she reported that her primary job-related difficulties were due to her physical condition. In addition, she stated that she has "trouble learning new tasks and it takes [her] longer."
>
> Claimant submitted letters, dated November 1987, from her counselors and her transcript from Booneville R-1, indicating a possible learning disorder and reporting a Stanford-Binet IQ score of 63. The counselors' letters report the claimant would likely need to be "under the umbrella of our social system".
>
> On ADL form, claimant reports caring for her son and pets. She prepares complete meals, performs household chores, goes out alone, drives, shops, manages finances, and socializes without difficulty. Claimant indicates that she can pay attention "all day," follows instructions "very well," and finishes what she starts. She does not need reminders.
>
> Claimant alleges disability due to the presence of learning disability. School records suggest the presence of that condition and there is historical record of intellectual functioning in the range of mild mental retardation. However, it is noteworthy that the claimant has since completed CNA training as well as working [at] SGA for several years. In addition, her daily functioning is not described as being adversely impacted by

12

Learning Disability, and she clearly is able to independently meet life demands at a level well beyond functioning intellectually in the range of mild mental retardation.

On August 6, 2009, plaintiff saw Hope Tinker, M.D., complaining of left shoulder and neck pain (Tr. at 214-215).

**Subjective:** . . . This is a chronic problem dating back years. Exacerbated 9 years ago when she had a[n] 'accident' working in housekeeping at Lakeview Health in Booneville. . . . Tina got Disability at age 18. She received a high school diploma but notes that it was always very hard for her in school. She struggled a lot and got a lot of help from family and friends with homework. She believes that her learning disability dates back through early grade school. . . . [H]er sister helped her through the disability process when she was 18. Through the years, she had occasional part-time temporary jobs. About 3 years ago she got initially a part-time job at the Braun Home working the evening shift 3-11, then after about 1 1/2 years, started working full-time. Part of her responsibility was shopping with the group's Food Stamps. She got into trouble for "mismanaging the funds." There was no abuse found after investigation. She just really did not know how to make the budget work. She got help from her supervisor and felt things were going better. Notes she did shopping for the group home during her off-hours. Early this year in January or February she got very sick with respiratory infections, she thinks walking pneumonia. Her car gave out. She was having to walk back and forth to work. She was fatigued, tired and sick. She got caught sleeping during the evening shift and subsequently was fired from her job at Braun. Started looking for a job in April. Did not get unemployment as the Braun Home fought it. She has not been able to find a job at all. She is getting some help from her sisters. She lost her Disability and SSI sometime over the last couple of years as she was making more money. . . . She was married, she thinks for about 7-8 years, maybe in 1999 or 2000. Notes that her husband did not want to work, so he made her work more during those years. She recently got approved for Food Stamps. She lives on her own with her 19-year-old son. He is a high school dropout and has been unable to pass the GED. She notes sometimes pain in her right arm and to her right forearm. Notes that she was diagnosed with rheumatoid arthritis at age 9. Has in the past had some wheezing. Had belly pain and some digestive problems several years ago and saw Dr. Akremi. . . . She denies current indigestion, dysphagia, nausea, vomiting or abdominal pain. Denies shortness of breath or wheezing currently. Denies chest pain or palpitations. Denies edema.

**Objective:** . . . She is alert and oriented. Some generalized decreased fund of general knowledge but is able to carry on a conversation.

Dr. Tinker noted marked asymmetry of the upper torso, neck and shoulders with "almost some webbing of the left neck and some prominence of the tendons/muscle bulk above the left scapula and clavicle." Plaintiff's grip was intact, she had some tenderness over

13

the left anterior shoulder and over the clavicle area as well as the left lateral neck, and there

was  some limited left lateral rotation and right rotation.

> **Assessment:**  1. Chronic possibly congenital (or birth injury) shoulder dysfunction w/chronic pain in shoulder and neck, certainly limiting her ability to do manual labor. 2. Lifelong learning disability, suspect borderline/low IQ. Certainly decreased functional skills in job market. 3. Past history of dyspepsia [indigestion] and abdominal pain. 4. Anisoccria,[7] undetermined etiology.  5. Remote diagnosis of childhood rheumatoid arthritis.

> **Plan:**  1.  I have encouraged her to apply for Medicaid through DFS.  2. She is long denied on her initial reapplication for disability. Given her limited intellectual function, history of learning disability and lack of sophistication dealing with the bureaucracy, she is going to need an advocate and most likely a lawyer to work her way through the disability process. We have discussed this.  3. Going to get records released from Rusk and see what we can learn about her neck and shoulder situation. Records from Dr. Akremi. Will follow up here as needed.

On February 10, 2010, Dr. Tinker wrote a letter to whom it may concern but addressed

to Karen Kraus Bill, plaintiff's Social Security attorney (Tr. at 216).

> I have provided primary medical care for Tina Downing intermittently for over 20 years.  I followed her through her pregnancy and the delivery of her son about 20 years ago.

> Tina has a life long history requiring assistance to be able to function in our society. She was a low birth weight baby whose mother was 40 years old when she was born. Tina reports that "they both almost died".  She was recognized in early childhood to have "learning disabilities" and completed high school only with dedicated assistance from family and the school system. She has been unable to hold full time jobs. She has exhibited a lack of insight and limited ability to manage her life and financial affairs.

> I suspect her IQ may be borderline further compounding the learning disability history. Tina also suffers physically from chronic shoulder and neck pain. She reports having been told at Rusk that she has a wry neck syndrome anomaly.  Her physical exam reveals marked asymmetry of her upper torso, neck and shoulders. This finding certainly contributes to her complaints of chronic pain exacerbat[ed] by attempts to do jobs requiring manual labor.

> Tina needs to be on disability. She is a sincere, motivated, honest individual who has tried to do the right things in her life.  As hard as she tries she just doesn't have the capability or skills to support herself through employment.

---

[7]Uneven pupil size.  Plaintiff reported that hers had been that way for a long time.

14

Eleven months later, on January 4, 2011, plaintiff was seen by Garth Russell, M.D., of Columbia Orthopaedic Group (Tr. at 248-253). He then wrote a letter to whom it may concern, which was presented to the Appeals Council but not to the Administrative Law Judge (who had rendered his opinion more than four months earlier):

> This is to state that this report is being made based upon an interview and physical examination in the offices of the Columbia Orthopaedic Group on January 4, 2011. . . . In addition past medical records will be reviewed.
>
> **HISTORY OF PRESENT ILLNESS:** This is a 48-year-old lady who dates her major difficulty from 2002. At that time she was employed by the Lakeview Health Center Nursing Home as a housekeeper near Booneville, MO. While working mopping the floor she slipped and fell sustaining an injury to her neck and back. She states that she was able to go home, but when she awoke the next morning her entire left upper extremity was numb and she had severe pain and stiffness in her neck and upper back. She was seen at the University of Missouri Medical Center where x-rays were taken and tests were made. The pain continued from her neck going down her left upper extremity. She was treated over several years and eventually had a series of Botox injections into her neck and left upper extremity. She continued on disability for a period of approximately five years. She then attempted to return to work. She initially started doing light work helping mentally handicap[ped] patients in the nursing home. As she assumed an increased amount of work she left her disability in 2007 and continued to work full time.
>
> As time went on however, the pain continued in her neck going down into her upper back and the left upper extremity. She noted that her neck was beginning to bend and her back was beginning to twist from side-to-side with curvature. She sought treatment again ast the University of Missouri Medical Center and was diagnosed with progressive scoliosis. She has been unable to return to gainful employment since the summer of 2009. She attempted to reduce her work back to two to three hours per day, but still could not meet the criteria required. She continues to treat her pain with anti-inflammatory medications. She is unable to drive and is assisted by her sister who drives her from place to place.
>
> **PAST MEDICAL HISTORY:** The patient fell at three years of age and sustained a central nervous system injury. She was noted to have a decrease in IQ and mental capacities since that time. She did take some education, but has been markedly limited in her capacity and abilities.
>
> **PHYSICAL EXAMINATION:** Physical examination reveals a well developed lady who does not appear to be in an any acute distress. She does appear to be somewhat confused with difficulty answering questions. They have to be asked two or three different ways to get the answers. In addition, her sister Bonnie, who was with her, gave much of the information. . . .

15

Further examination reveals that her neck is rigid. She has essentially no rotation to the right past 10 degrees.[8] There is 40 degrees of rotation to the left. There is essentially only 15 degrees of forward flexion with 10 degrees of hyperextension. There is no lateral deviation to the right with 10 degrees to the left.

Examination of her upper extremities reveals the neurological structures to have limited function. There is severe muscle spasm in the paraspinous muscles extending down into the parascauplar area. Her entire neck and upper back are rigid.

Again, it was very difficult to have her follow instructions during the interview as she became confused. It is obvious that her mental reaction is impaired.

**X-RAYS:** X-rays made at the Columbia Orthopaedic Group on January 4, 2011, reveal there is a deformity curvature of 40 degrees forward flexion within the neck. The curvature is approximately at C2-3 and at C4-5. There are severe degenerative changes present within all the facet joints.

Forward flexion studies show that all of the motion is occurring between C5 and 6. There is no motion to the remainder of the cervical area. Complete extension reveals severe degnerative changes with previous deformity and fractures at C5-6 area.

The x-rays however, do show that the foramen[9] are open.

AP[10] reveals that there is a marked scoliosis in the thoracic and cervical area with a

---

[8]



[9]Vertebral openings (foramina) which house the spinal nerve roots as they branch off the spinal cord.



[10]An X-ray picture in which the beams pass from front-to-back (anteroposterior).

16

marked depression of the left shoulder. The cervical spine continues in continuity with the thoracic spine with all of the deviation being at the C2-3 area.

Further examination reveals that there is a reactive scoliosis in the thoracic area; however it is not acute in nature. There are moderate degnerative changes in the upper area of the back.

**REVIEW OF MEDICAL RECORDS:**  A review of the following records were [sic] made:
1.      University of Missouri Medical Center, Physical Medical and Rehab Clinic.
2.      Cooper County Memorial Hospital, Booneville, MO.
3.      Dancing Horizon Family Care, Booneville, MO [Dr. Tinker].
. . . The next record seen was dated February 22, 2005. She noted migraine headaches, but continued with cervical dystonia.  She was given further multiple injections [of botox]. . . .  This further indicated that she was to be seen in three months for further injections.

The record of the following period was not available.[11]

The next record was from the Family Care Center occurring on November 2, 2005.  She was having pain in her abdomen and was treated for a urinary tract infection.

She also was seen on January 28, 2006, because of chronic pain in her right hip secondary to scoliosis. . . . She was given a Medrol Dosepak with Hydrocodone, a significant pain medication.

She was next treated musculoskeletal-wise on November 18th. . . . [S]he was treated for headaches and for scoliotic pain.

She continued taking Hydrocodone with Prednisone for treatment.

She did have some reaction to the Hydrocodone and was treated appropriately.

The next records available were dated September 22, 2008 [when] she had fallen from a wagon. . .

She subsequently was seen intermittently in the emergency room because of continued pain within her neck, right shoulder and upper back.  The x-rays that were taken following the fall revealed some widening of the acromioclavicular joint, but otherwise no fractures.

---

[11]It is unclear what Dr. Russell meant by this.  There were no further records of Botox injection in the file.  Perhaps he assumed plaintiff would continue her Botox treatment because she had indicated it was working well and was instructed to come back in three months.  In fact, about 3 1/2 months after her last Botox injection, Dr. Akremi noted that the injections were working well for her.  Plaintiff continued to seek medical care, but apparently did not return for further Botox injections.

17

An extensive workup and evaluation of the patient was performed on August 6, 2009, in the Family Health Clinic in Fayette, MO.

She was seen because of pain in her left shoulder and neck. She indicated that she had symptoms during her life and some nine years previously had injured it while working as a housekeeper . . .

She had been discharged and had continued to receive treatment over the ensuing years with Botox injections. Her history was that during her birth there were complications with neuromuscular physical impairments resulting. She had attempted to return to work in 2006 on a part-time job. She was unable to do so and was discharged because of mismanagement and the inability to perform her duties.

She mentally was unable to complete her education.

Her examination at that time revealed a mental incapacity with difficulty in pursuing a conversation for the history and examination. There was marked asymmetry of her upper torso, neck and shoulders with marked deformity. Her fingers were short bilaterally with deformities of her upper extremities.

The assessment was: (1) Chronic congenital dysfunction of the neck and shoulders with chronic pain; (2) Suspect borderline low IQ.

There had also been a diagnosis of rheumatoid arthritis made in her childhood.

**FINAL DIAGNOSIS:**
1. Cervical and thoracic dystonia, severe, particularly involving the left shoulder and upper back.
2. Scoliosis, severe with chronic low back pain secondary to above.
3. Mental impairment, moderate to severe secondary to congenital injury at birth.

**DISCUSSION:** This is a 44-year old lady who has moderate to severe physical incapacity with marked curvature of her neck involving particularly her left upper extremity and upper back. She has had extensive treatment over the past seven to eight years with Botox injections in an effort to relieve her symptoms. She also has marked mental insufficiency with low IQ. She has worked at several tasks, which required a limited amount of mental capacity, but has been unable to continue.

The jobs that she has performed have been closely supervised with assisting other handicap[ped] people.

At the present time she shows marked physical changes in her upper back and neck. There is essentially no motion in her left shoulder and upper back. The musculature has a hard rubbery consistency.

Based upon the above it is my medical opinion that this patient is unable to pursue gainful employment for the following reasons:

18

1.  Marked mental incapacity, chronic secondary to birth injury.
2.  Cervical dystonia secondary to neurological injury, chronic with continued severe spasticity curvature with limited ability to function physically requiring chronic Schedule II narcotic pain medication.

The patient has further reached the point that rehabilitation is not possible secondary to the above.

## D.   SUMMARY OF TESTIMONY

During the February 12, 2010, hearing, plaintiff testified; and Julie Harvey, a vocational expert, testified at the request of the ALJ.

## 1.   Plaintiff's testimony.

At the time of the hearing plaintiff and her 19-year-old had been living in Fayette for the past ten years (Tr. at 28). Plaintiff has a high school education, she went to school to be a certified nurse assistant ("CNA"), and she has further medical training (Tr. at 28). Plaintiff worked as a CNA from 2006 to 2008 (Tr. at 29). She worked as a hotel housekeeper from 2000 to 2005 (Tr. at 29).

Plaintiff's alleged onset date is March 16, 2009 (Tr. at 29). When asked why she could no longer work as of that date, plaintiff said, "Well, because I was let go because I fell asleep on my shift, and I -- it was misuse of food stamp funds. I was taking care of clients, and I overshot the budget too much on the food stamps. And then plus I fell asleep on my shift, which during that time, I had a respiratory infection and walking pneumonia at the same time. And I just kept on working because I couldn't afford to not work." (Tr. at 30). Although plaintiff had vacation time and sick leave she could have taken, she did not consider that because "I always liked to stay working." (Tr. at 30). The job was not too difficult for plaintiff, but she was fired after she got sick and fell asleep (Tr. at 34).

Plaintiff left her job as a hotel housekeeper because she wanted something better (Tr. at 32). Plaintiff slipped and fell on the floor when she was working as a housekeeper and she

19

"twisted her body wrong" (Tr. at 32). "And ever since then, it's never been right." (Tr. at 32). Her body has not been right for nine years, "and nothing's changed" (Tr. at 34).

Plaintiff began working at McDonald's in October 2009 and currently works there (Tr. at 33). Plaintiff is paid $7.25 per hour and earns approximately $120 every other week (Tr. at 33, 35). Plaintiff could not work full time at McDonald's "because nobody works 40 hours at McDonald's." (Tr. at 36). If McDonald's offered her a 40-hour-a-week job, she does not think she could do it because of her arthritis (Tr. at 36-37). She experiences pain in her shoulder, neck, ankle, and hip (Tr. at 37).

Plaintiff previously received disability while she worked part time (Tr. at 35). In 2007 she went to full time work and in March 2007 her benefits were terminated because she was making too much money (Tr. at 35).

Plaintiff experiences shoulder pain which gets worse in cold weather (Tr. at 37). Plaintiff's pain causes her to have trouble focusing and it is hard for her to sit because she cannot relax (Tr. at 37-38). She uses Ibuprofen and a heating pad for her pain (tr. at 38). When she works at McDonald's it takes longer for her to unwind and relax because it is a fast-paced work environment (Tr. at 38).

Plaintiff has rheumatoid arthritis in her left hand (Tr. at 38-39). She has trouble fixing drinks, cooking and some cleaning because of her hands (Tr. at 39). When asked what happens when she tries to cook with her hand pain, plaintiff said, "I don't know, it just -- it's just hard, the pain just stays there unless I take some Ibuprofen to help knock it out, you know, take the pain away." (Tr. at 39).

Plaintiff cannot turn her head without turning her whole body because of the injury she sustained when she was a housekeeper (Tr. at 39-40).

20

Plaintiff has seen Dr. Tinker since 1990 (Tr. at 39). When plaintiff is not working, she watches television, plays with her dogs, tries to clean and do everyday things (Tr. at 40). Plaintiff cooks, she does dishes, dusts, sweeps, mops, vacuums, makes beds, does laundry, takes out the trash, and goes shopping once a month for about an hour without resting (Tr. at 40-43). Plaintiff takes care of her two dogs (Tr. at 43). She exercises about once a week for 30 minutes, and she likes to walk (Tr. at 43). She can walk uptown which is about a mile (Tr. at 43). She visits with friends and relatives and eats out once in a while (Tr. at 44). She gets along with other people very well; she can balance her checkbook, make sure she pays her bills on time and get to her appointments (Tr. at 44). Counting change is sometimes "kind of hard" (Tr. at 45). At work the cash register tells her how much change people get and she relies on that (Tr. at 45). Plaintiff is able to take care of her own personal hygiene, she reads magazines and newspapers a couple times a week (Tr. at 45). She has a valid driver's license and can drive but does not currently drive because her car is not licensed (Tr. at 41). Plaintiff took the written driving test when she was 16 (Tr. at 41-42). It took her six times to pass the test (Tr. at 42). Plaintiff has not had any car accidents in the past 20 years and has not had any tickets in the past six years (Tr. at 42). Plaintiff is bad with directions (Tr. at 42).

Plaintiff is able to stand "for quite a while" because she does that while working at McDonald's (Tr. at 46). She can walk a mile in 20 to 30 minutes with at least one break (Tr. at 46-47). Plaintiff can pick up and carry a gallon of milk (Tr. at 47).

## 2. Vocational expert testimony.

Vocational expert Julie Harvey testified at the request of the Administrative Law Judge. Plaintiff's past work experience consists of nurse aid, DOT 355.674-014, medium with an SVP of 4, semi-skilled, and hotel housekeeper, DOT 323.687-014, light with an SVP of 2, unskilled (Tr. at 48).

The first hypothetical involved a person who could perform light work but who could only occasionally climb balance, stoop, kneel, crouch, and crawl; could not do any kind of overhead work; could not work around extreme heat or cold (anything 80 degrees or more or anything 65 degrees or less); must avoid any sort of fumes, dust, gases, and poor ventilation; and can only understand, remember and carry out simple instructions, make simple work-related decisions, and only occasionally deal with changes in work processes and environment (Tr. at 49). The vocational expert testified that such a person could perform plaintiff's past relevant work as a hotel housekeeper (Tr. at 49).

The second hypothetical was the same as the first except the person could only occasionally use her upper extremities for reaching, handling, grasping, fingering and feeling (Tr. at 49). The vocational expert testified that such a person could not perform the housekeeping position (Tr. at 49). However, the person could work as an usher, DOT 344.677-014, which is a light job with an SVP of 2 (Tr. at 50). There are 900 jobs in Missouri, 33,100 in the country (Tr. at 50). The person could also work as a children's attendant, DOT 349.677-018, with his light with an SVP of 2 (Tr. at 50). There are 1,000 positions in Missouri and 35,700 in the country (Tr. at 50). The person could work as a fruit distributor, DOT 921.685-046, which is light with an SVP of 2; 100 in Missouri and 4,100 in the country (Tr. at 50).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Douglas Stults entered his opinion on August 25, 2010 (Tr. at 11-19). He found that plaintiff's last insured date is December 31, 2013 (Tr. at 13).

Step one. Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 13). Although she continues to work one day a week for eight hours per day, her earnings do not rise to the level of substantial gainful activity (Tr. at 13).

22

Step two.  Plaintiff has the following severe impairments:  shoulder dysfunction, chronic neck and shoulder pain, and a learning disability (Tr. at 13).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 14-15).

Step four.  Plaintiff retains the residual functional capacity to perform light work except that she can only occasionally climb, balance, stoop, kneel, crouch, and crawl; she can perform no overhead work; she must avoid exposure to temperatures of more than 80 degrees or less than 65 degrees; should avoid exposure to pulmonary irritants such as fumes, dusts, gases, and poor ventilation; she can frequently but not constantly use her upper extremities for reaching, handling, grasping, fingering and feeling; and she can understand, remember and carry out simple instructions, make only simple work related decisions, and deal with only occasional changes in work processes and environment.  With this residual functional capacity, plaintiff can perform her past relevant work as a hotel housekeeper (Tr. at 18).

## VI.    LISTING 12.05C

Plaintiff argues that the ALJ erred in finding that plaintiff's impairment does not meet Listing 12.05C because "Plaintiff has an IQ of 63, . . .  Plaintiff's school records from 1985 . . . demonstrate onset no later than 1985 when the Plaintiff was 18. . . [and] the ALJ found 'severe' impairments of 'shoulder dysfunction with chronic pain in the shoulder and neck; and learning disability . . . and noted several significant restrictions."

The ALJ analyzed plaintiff's impairments under Listing 12.05 and found that the listing was not met because plaintiff did not have deficits in adaptive functioning.

The Eighth Circuit has interpreted Listing 12.05C -- mental retardation -- to require a claimant to show each of the following three elements:  "(1) a valid verbal, performance, or full scale IQ score of 60 through 70, (2) an onset of the impairment before age 22, and (3) a

Case 2:12-cv-04140-REL   Document 20   Filed 04/22/13   Page 23 of 37

physical or other mental impairment imposing an additional and significant work-related limitation of function." McNamara v. Astrue, 590 F.3d 607, 610-611 (8th Cir. 2010), quoting Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006). In addition to these three elements, the claimant must establish deficits in adaptive functioning and that those deficits initially manifest during the developmental period, i.e., before age 22. This final requirement is found in what is referred to as the "introductory paragraph" of Listing 12.05.

Although plaintiff addresses the three initial elements of the listing, plaintiff does not address the requirements in the introductory paragraph.

In Cheatum v. Astrue, 388 Fed. Appx. 574, 576-577 (8th Cir. (Mo.) July 30, 2010), the court addressed a similar argument:

> On appeal, Cheatum argues that the introductory paragraph of Listing 12.05 does not require evidence of deficits in adaptive functioning if the claimant meets the requirements of one of the subsections, in her case subsection C. She relies on language taken from Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006), in which we summarized that "to meet Listing 12.05C, a claimant must show: (1) a valid verbal, performance, or full scale IQ of 60 through 70; (2) an onset of the impairment before age 22; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function." Although Cheatum meets this three-part test, she ignores our explicit statement in Maresh that "the requirements in the introductory paragraph are mandatory." Id. Those requirements clearly include demonstrating that the claimant suffered "deficits in adaptive functioning" and that those deficits "initially manifest during the developmental period [before age 22]." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05; see Randall v. Astrue, 570 F.3d 651, 659-660 (5th Cir. 2009) (holding that Listing 12.05 requires claimant to demonstrate deficits in adaptive functioning in case where claimant otherwise meets the requirements in Listing 12.05C, citing similar rulings in other circuits).
>
> Cheatum goes on to argue that if she is required to demonstrate deficits in adaptive functioning, she met this requirement through evidence that she was "placed in an educatable mentally retarded self contained classroom at the junior high school level." But this evidence, when taken in light of Cheatum's own testimony, does not necessitate a finding that she suffered deficits in adaptive functioning. There is no indication in the record that the school's recommendation for Cheatum's classroom placement was made by a qualified mental health professional. Further, Cheatum testified that her school work suffered because she was caring for her mother who was sick with cancer and she had to commute between towns to attend school. The evidence also showed that Cheatum had maintained employment in semi-skilled and unskilled positions for many

24

years.[FN3 As the district court correctly noted, evidence of Cheatum's ability to perform gainful activity is not relevant if she otherwise meets the requirements of Listing 12.05. See Maresh, 438 F.3d at 901. It is relevant, however, to whether she has shown the deficits in adaptive functioning necessary to meet that listing.] She was able to perform activities of daily living and light housework, drive a car, help prepare meals, and care for her father who was suffering from Alzheimer's. In addition, Dr. Michah Mazurek, a licensed psychologist who evaluated Cheatum in March of 2007, diagnosed Cheatum as having "Borderline Intellectual Functioning," as opposed to mental retardation. Dr. Mazurek specifically stated that "there is no evidence to suggest concurrent adaptive impairments at the level to warrant a diagnosis of mental retardation."

Accordingly, the Commissioner's conclusion that Cheatum failed to establish the deficits in adaptive functioning necessary to meet Listing 12.05 is supported by substantial evidence.

In this case, plaintiff was not in special education. She graduated from high school, albeit with relatively low grades, but also with some As, Bs, and Cs. She went on to obtain additional education to become a certified nurse's assistant and received further medical training. By contrast the plaintiff in Maresh v. Barnhart, 438 F.3d 897, 900 (8th Cir. 2006), proved that mental retardation manifested itself before age 22 because he struggled in special education classes through 9th grade and then dropped out of school; had trouble with reading, writing and math; got into frequent fights with other children; and his employment history consisted of only a couple weeks of employment after which he was terminated. In Christner v Astrue, 498 F.3d 790, 793 (8th Cir. 2007), the claimant dropped out of school in a low grade and after having been in special education classes. The court found that the claimant "likely met his burden of establishing onset before age twenty-two" because he had been unable to read or write, he had been unable to live independently, he was unable to keep jobs because he was slow, and he had a limited work history as a result.

The ability to work at the substantial gainful activity level for many years is "not relevant if [the claimant] otherwise meets the requirements of Listing 12.05. It is relevant, however, to whether she has shown the deficits in adaptive functioning necessary to meet that

25

listing." Cheatum v. Astrue, supra, citing Maresh v. Barnhart, 438 F.3d at 901. In this case, plaintiff worked at a semi-skilled job (CNA), she prepares complete meals, she takes care of her household, does laundry, organizes closets and cabinets, drives and goes out alone, shops, pays bills, handles her bank accounts, counts change and uses a checkbook. She can pay attention for a long time, she follows instructions very well, she finishes what she starts.

As was the case in Cheatum, the evidence from plaintiff's high school and vocational school does not establish that any diagnosis or recommendation was made by a qualified mental health professional. Both her high school counselor -- who wrote a letter saying that plaintiff "will have to be under the umbrella of our social system" -- and her vocational technical school counselor -- who wrote that plaintiff's "handicap, as assessed in Boonville High School, is a hindrance to her employability. . . . It is my recommendation that she be considered as a recipient for Social Security benefits" -- left out any educational credentials. The only test result mentioned in either letter was the result of the IQ test; however, as was the case in Cheatum, there is no indication that the test was administered by a qualified mental health professional.

Based on the above, I find that the substantial evidence in the record supports the ALJ's finding that plaintiff's impairment does not meet Listing 12.05C because the evidence does not establish deficits in adaptive functioning before age 22.

## VII. FAILING TO ORDER A CONSULTATIVE EVALUATION

Plaintiff next argues that "to the extent the ALJ implicitly discounted the Plaintiff's 1985 IQ scores as out of date, the ALJ should have ordered a new IQ test." The ALJ did not discount the IQ score as out of date, and because the evidence does not establish deficits in adaptive functioning before age 22, a new IQ test would be irrelevant.

Case 2:12-cv-04140-REL   Document 20   Filed 04/22/13   Page 26 of 37

## VIII.    CERVICAL DYSTONIA AND SCOLIOSIS

Plaintiff argues that the ALJ "failed to mention the diagnosis of cervical dystonia the diagnosis of scoliosis, the botox injections, or the loss of range of motion. The ALJ failed to appreciate the severity of the Plaintiff's shoulder, neck, and back problems." Plaintiff offers no further argument on this issue; therefore, I assume she means that the ALJ should have assessed a more restrictive residual functional capacity. However, since she provided no argument on this issue, she obviously did not suggest what functional limitations should have been found.

The ALJ found that plaintiff could do light work except no overhead work, could only occasionally balance, climb, stoop, kneel, crouch and crawl. She could frequently but not constantly use her upper extremities for reaching, handling, grasping, fingering and feeling.

In her Disability Report plaintiff reported that her condition limits her ability to work in that she has trouble lifting and sitting because of shoulder and neck pain. In a Missouri Supplemental Questionnaire plaintiff noted that she is able to work puzzles or watch movies for two hours at a sitting. In a Function Report, she said that she is able to cook, vacuum, do dishes, and clean the bathroom. She can clean out closets and cabinets. When asked what she was able to do before her alleged onset date that she could no longer do, plaintiff wrote "N/A." When asked what physical abilities are affected by her condition, plaintiff circled only reaching.

Plaintiff argues in her brief that her shoulder impairment dates back before her alleged onset date; however, she fails to recognize that she was able to work at the substantial gainful activity level during that time which does not support her position.

I find that the ALJ's residual functional capacity assessment properly takes into account the credible physical limitations.

## IX.   *ALJ'S DECISION AS COMPARED TO OPINION OF DR. GARTH RUSSELL*

Finally, plaintiff argues that the "comprehensive orthopaedic evaluation" of Dr. Garth Russell which was presented to the Appeals Council corroborates the "very specific notations from Dr. Tinker, who had treated Plaintiff for 20 years."  These records together, plaintiff argues, establish that the ALJ's decision is not supported by substantial evidence.

First I must point out that Dr. Russell's report is hardly a "comprehensive orthopaedic evaluation" and that Dr. Tinker's notes were not "very specific notations" covering "20 years." I shall address each doctor separately.

Dr. Tinker

Although Dr. Tinker states that she has treated plaintiff "intermittently" for over 20 years, the record includes only one office visit and one letter from Dr. Tinker to plaintiff's disability lawyer.  As the ALJ noted, Dr. Tinker's medical record makes her sound more like a disability lawyer than a treating doctor.

Plaintiff saw Dr. Tinker on August 6, 2009, approximately one month after her initial application for disability benefits had been denied.  In more than half of Dr. Tinker's two-page record, she recounts plaintiff's report of her schooling and her medical condition:  It was hard for her in school. She struggled a lot and got help from family and friends with homework. She believes her learning disability dates back through early grade school.  One of plaintiff's responsibilities at her job was to shop with the group's food stamps.  Plaintiff got in trouble for mismanaging the funds, but no abuse was found after an investigation.  She got help from her supervisor doing the budget work.  Plaintiff's car gave out and she had to walk back and forth to work when she had walking pneumonia.  She got caught sleeping during her shift and was fired.  She was denied unemployment as her employer fought her application.  She has looked but has been unable to find a job.  She is getting help from her sisters.  When she was married,

28

her husband did not want to work so he made her work. Plaintiff recently got approved for food stamps. Plaintiff lives on her own with her 19-year old son who dropped out of high school and has not passed the GED.

This is the bulk of Dr. Tinker's medical record. It does not even mention any medical problem related to any of this; it is merely a recitation of plaintiff's history as it pertains to Dr. Tinker's belief that plaintiff should be receiving disability benefits. In fact, her assessments are related to nothing more than plaintiff's disability case:

1. Chronic possibly congenital or birth injury shoulder dysfunction with chronic pain in shoulder and neck, *certainly limiting her ability to do manual labor.*

2. Lifelong learning disability, suspect borderline/low IQ. *Certainly decreased functional skills in job market.*

3. Past history of [indigestion] and abdominal pain.

4. [Uneven pupil size], undetermined etiology.

5. Remote diagnosis of childhood rheumatoid arthritis.

Dr. Tinker's plan was likewise related to plaintiff's obtaining benefits and not related to improving her medical condition:

1. *I have encouraged her to apply for Medicaid through DFS.*

2. *She is long denied on her initial reapplication for disability. Given her limited intellectual function, history of learning disability and lack of sophistication dealing with the bureaucracy, she is going to need an advocate and most likely a lawyer to work her way through the disability process.*

3. Going to get records released from Rusk and see what we can learn about her neck and shoulder situation. Records from Dr. Akremi.

29

4. Will follow up here as needed.

Dr. Tinker's notes of the relevant physical exam consist of the following:

There is marked asymmetry of the upper torso, neck and shoulders with almost some webbing of the left neck and some prominence of the tendons/muscle bulk above the left scapula and clavicle. Fingers are quite short bilaterally although grip intact. Tender left anterior shoulder and over the clavicle area as well as the left lateral neck. Some limited left lateral rotation and right rotation. Lungs: Clear. Heart: RRR [regular rate and rhythm] without murmur, gallop or click. Abdomen: Overweight. Soft. Generalized tenderness. LS [lumbosacral spine, or lower back] negative. Wrists, knees and ankles without acute inflammation and w/o edema. Gait WNL [within normal limits].

The only observation relevant to plaintiff's disability case is the reduced range of motion in her neck and the medical condition causing that symptom. However, Dr. Tinker did not provide the range of motion measurements. Plaintiff went to the emergency room in 2008 and in 2009, and on both occasions she was noted to have pain-free range of motion in her neck. Although Dr. Akremi noted reduced range of motion, she did not provide range of motion measurements and her assessments were done in 2006 and 2007 -- well before plaintiff's alleged onset date in 2009. The fact that plaintiff had pain-free range of motion in 2008 and 2009, and there is no evidence of any intervening trauma, calls into question the validity of Dr. Tinker's range of motion findings, especially since she did not provide those range of motion measurements. Additionally, Dr. Tinker did not provide any opinion as to which functional abilities would be affected by plaintiff's limited range of motion. In fact, no doctor found that plaintiff had any functional restrictions as a result of her limited range of motion.

Turning to Dr. Tinker's letter to plaintiff's disability lawyer dated February 10, 2010 -- six months after her one visit with plaintiff -- I note that again, as the ALJ pointed out, this letter is not a medical opinion. It is Dr. Tinker's urging that plaintiff be awarded disability benefits. Dr. Tinker stated that plaintiff has a life-long history of needing assistance to function in society and that she has been unable to hold full-time jobs. As the ALJ pointed out, this is

30

erroneous, as plaintiff was able to earn a certification to be a nurse's assistant and worked in a semi-skilled job. Although Dr. Tinker stated her suspicion that plaintiff may have a borderline IQ, she did not observe any difficulties that plaintiff had with understanding, communicating, following directions, etc. Dr. Tinker pointed out that plaintiff has asymmetry in her upper torso, neck and shoulders which "certainly contributes to her complaints of chronic pain exacerbat[ed] by attempts to do jobs requiring manual labor." As the ALJ pointed out, this is not a medical opinion. The ALJ had this to say about Dr. Tinker's opinion:

> On February 10, 2010, Hope Tinker, M.D., claimant's treating physician, noted: "... She was recognized in early childhood to have 'learning disability' ... She has been unable to hold full time jobs... I suspect her IQ may be borderline... She reports having been told at Rusk that she has a 'wry neck syndrome'... certainly contributes to her complaints of chronic pain... by attempts to do jobs requiring manual labor. Tina needs to be on disability." Dr. Tinker wrongly concluded that the claimant has been unable to hold full time jobs. Also, Dr. Hope [sic] bases her conclusions on claimant's self-reports regarding neck and shoulder pain. Further Dr. Tinker discusses the claimant's pain when attempting to perform manual labor, yet Dr. Tinker is not a vocational expert, and is not an expert in the jobs available that such an individual can perform. Also, Dr. Tinker is making conclusions on disability reserved to the Commissioner. For those reasons, Exhibit B6F [her letter] is rejected.

(Tr. at 17-18).

The ALJ then quoted from Dr. Tinker's one medical record and made the following observations:

> Again, Dr. Tinker makes assumptions based on claimant's self-reports and even states she is going to get the records about the claimant's neck and shoulder problems later. She goes so far as to speculate that the problems are congenital although record show the claimant sprained her shoulder after falling from a wagon. Dr. Tinker is acting more like a legal advocate than a medical provider. Exhibit B5F [the opinion in the medical record] is rejected.

(Tr. at 18).

The ALJ's opinion is well-founded. There is no medical basis for any of Dr. Tinker's conclusions. Indeed, had plaintiff been suffering from the kind of disabling pain described by Dr. Tinker, one would expect to see some form of treatment recommendation other than that

31

plaintiff try to get Medicaid, food stamps and Social Security disability. She does not even recommend so much as over-the-counter pain relievers. She does not observe that Botox was working well but plaintiff stopped getting those injections, and she does not recommend that plaintiff give that another try. She prescribed no medication, no physical therapy, no home exercises or relaxation techniques. In connection with plaintiff's disability case, as a treating physician she could have chosen to perform an examination, report her findings, and assess an opinion as to plaintiff's functional limitations. Instead she only provided her opinion that plaintiff cannot do manual labor. This is a decision reserved for the Commissioner and is not a medical opinion.

Dr. Tinker stated that plaintiff needs to be on disability. Dr. Tinker provided no opinion that was of any use to the ALJ because her only opinion in this letter was that plaintiff should be awarded disability benefits. The ALJ properly gave no weight to the opinion of Dr. Tinker. Dr. Russell:

Dr. Russell's report was presented only to the Appeals Council as it was prepared after the ALJ rendered his opinion. Because the Appeals Council considered this new evidence but denied review, the court must determine whether the ALJ's decision was supported by substantial evidence in the record as a whole including the new evidence. Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007).

Dr. Russell's opinion suffers from the same flaws as Dr. Tinker's -- he does not provide a medical opinion, but instead provides his opinion that plaintiff should be awarded disability benefits. Dr. Russell indicated that plaintiff's sister provided most of the information during his evaluation of plaintiff which is perhaps the reason for some inaccuracies in his report. For example, he stated that plaintiff is unable to drive and has to be driven around by her sister. However, plaintiff testified that she is capable of driving, but she cannot drive at the present

time because her car is not licensed. Dr. Russell stated that plaintiff "did take some education," without observing that she graduated from high school, was not in special education classes, and subsequently earned a CNA certificate.

Dr. Russell wrote that plaintiff had difficulty answering questions; that questions had to be asked two or three different ways to get the answers. Because plaintiff had no difficulty answering questions during her administrative hearing and no other doctor observed any difficulty with plaintiff's ability to answer questions, it appears that this was simply reported to Dr. Russell as opposed to observed by him.

Dr. Russell reported plaintiff's cervical range of motion measurements which conflict with an emergency room notation that plaintiff had "full and pain-free range of motion in her neck." The emergency room visit was on September 22, 2008, and was in connection with treatment whereas Dr. Russell's findings were made after the ALJ denied benefits and in connection with plaintiff's disability appeal. The treatment notes from the emergency room are more persuasive than the medical record obtained for the sole purpose of supporting a disability case -- A patient is less likely to exaggerate symptoms when treatment depends on the information provided to the doctor, and is more likely to exaggerate symptoms when the information is presented to a doctor for the sole purpose of supporting an application for government benefits.

Dr. Russell compared plaintiff's x-rays to "previous deformity and fractures at C5-6" however, there is no evidence that plaintiff ever had a neck fracture. Dr. Russell discusses the medical records from treating doctors which he reviewed in connection with his exam. He mentioned a medical record from "November 18" in which plaintiff was treated for scoliotic pain and said that she "continued taking Hydrocodone with Prednisone for treatment." There is no medical record dated November 18. The only medical record which shows a prescription

for Hydrocodone and Prednisone is a February 3, 2007, record of Dr. Akremi. On that visit, plaintiff complained of pain in her right breast radiating to other parts of her torso and said she had been under a lot of stress. Dr. Akremi prescribed Hydrocodone and Prednisone and indicated that plaintiff needed physical therapy and an MRI. She directed plaintiff to come back for massage; however, there is no indication in the record that plaintiff tried physical therapy or came back to Dr. Akremi for massage therapy. She had an MRI of her shoulder a year and a half later, and that showed only minimal degeneration of a tendon.

As far as plaintiff's medications, Dr. Russell remarked that plaintiff required chronic Schedule II narcotic pain medication and that at one point she reported a reaction to Hydrocodone and was "treated appropriately." However, the medical records show that plaintiff has not required chronic Schedule II narcotic pain medication. The record reflects that she was given a prescription for 40 Hydrocodone pills to take as needed for pain in January 2006. In late March 2006, she was given another prescription for 60 pills. Both of those were to treat hip pain. On February 3, 2007, she was given a prescription for 60 pills after she reported radiating pain in her breast. She was given 20 Percocet tablets in September 2008 after she fell out of the wagon. Therefore, during the entire length of this medical record, plaintiff was prescribed a narcotic four times only, the last time being almost 3 1/2 years before Dr. Russell wrote this report. Most of the medical records reflect that plaintiff was taking no medication other than for GERD. And the "appropriate treatment" after plaintiff reported a possible allergic reaction to Hydrocodone was to recommend massage and soaking in Epsom salt, both obviously conservative treatment measures.

Dr. Russell reported that plaintiff was treated intermittently in the emergency room because of pain in her neck, right shoulder and upper back. However, plaintiff actually went to the emergency room only twice -- once three days after she fell off a wagon, and another

34

time for treatment of a cough. Dr. Russell reported that plaintiff had an extensive workup and evaluation performed by Dr. Tinker, but as mentioned above, Dr. Tinker merely provided an opinion that plaintiff be awarded disability benefits and recommended no treatment at all.

Dr. Russell appears to indicate that plaintiff went through multiple series of Botox treatments; however, the medical records show only that plaintiff had two injections, one in 2004 and one in 2005. Although plaintiff reported good results, Dr. Childers recommended that she return for regular Botox treatments, and Dr. Akremi indicated that the Botox treatment was beneficial for plaintiff's neck condition, the record does not reflect that plaintiff had any Botox therapy other than on those two occasions many years before her alleged onset date.

Dr. Russell noted that plaintiff was discharged from her last full-time job because she was unable to perform her duties; however, plaintiff testified that she was fired for sleeping on the job. Dr. Russell noted that plaintiff was unable to complete her education; however, it is undisputed that plaintiff earned a high school diploma and furthered her education by earning a certificate to be a nurse's assistant. Dr. Russell mentions that plaintiff's medical records found deformities in her upper extremities; however, there is no such finding in the record before me.

Dr. Russell assessed cervical and thoracic dystonia and scoliosis, both conditions that plaintiff had while she engaged in full-time employment prior to her alleged onset date. He also assessed "mental impairment, moderate to severe secondary to congenital injury at birth." However, Dr. Russell did no mental testing, and of course any impairment that had been present since birth would not have prevented plaintiff from working full-time as she did so for several years despite this impairment. When an individual has worked with an impairment over a period of years, absent significant deterioration, it cannot be considered disabling at

35

present. <u>Van Vickle v. Astrue</u>, 539 F.3d 825, 830 (8th Cir. 2008). The record does not contain evidence of significant deterioration, as plaintiff failed to receive regular treatment for her impairments during the relevant time period. <u>Edwards v. Barnhart</u>, 314 F.3d 964, 967 (8th Cir. 2003) (failure to seek regular medical care seriously undermines a claimant's case).

As was the case with Dr. Tinker, Dr. Russell did not provide any medical opinion that could be used by the ALJ. He did not discuss any functional limitations at all. He merely provided his opinion that plaintiff is "unable to pursue gainful employment." This is not a medical opinion. Whether plaintiff is capable of gainful employment is a finding reserved to the Commissioner. <u>Robson v. Astrue</u>, 526 F.3d 389, 393 (8th Cir. 2008). It is unfortunate that Dr. Tinker and Dr. Russell chose this approach, as their examinations and opinions are essentially useless to the ALJ and hence to the plaintiff's case. Providing opinions which are legally worthless did not help plaintiff at all. However, a medical opinion stating what functional limitations are caused by plaintiff's medical condition would have been of some benefit to the ALJ when he was making his decision.

Because Dr. Russell's report is not credible and does not provide a medical opinion, I find that the substantial evidence in the record as a whole -- which includes his report -- supports the ALJ's finding that plaintiff is not disabled.

X.   *CONCLUSIONS*

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

Case 2:12-cv-04140-REL   Document 20   Filed 04/22/13   Page 36 of 37

ORDERED that the decision of the Commissioner is affirmed.


_____/s/ Robert E. Larsen_____
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
April 22, 2013